**REX SYSTEMS, INC., Appellant,**

v.

**William S. COHEN, Secretary of Defense, Appellee.**

**No. 99–1527.**

United States Court of Appeals, Federal Circuit.

Sept. 14, 2000.

James S. Phillips, Williams, Mullen, Clark & Dobbins of Vienna, VA, argued for appellant. On the brief was James S. Delsordo.

Gregory T. Jaeger, Commerical Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. On the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; Bryant Snee, Assistant Director; and Laureen D. Kapin, trial

attorney. Of counsel on the brief was Steven Gruenwald of Washington, DC.

Before MICHEL, LOURIE, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Rex Systems, Inc. ("RSI") appeals from a decision of the Armed Services Board of Contract Appeals ("Board") granting summary judgment for the government and denying RSI's appeal from a Contracting Officer's denial of its claim for interest on amounts paid under a termination for convenience settlement. The Board issued its initial decision on December 21, 1998, *Appeal of Rex Systems, Inc.*, ABSCA No. 49502 (Dec. 21, 1998), and affirmed its original ruling on April 20, 1999. *Appeal of Rex Systems, Inc.*, ABSCA No. 49502 (Apr. 20, 1999) (reconsideration). After the government terminated a contract with RSI for convenience, the government and RSI agreed upon a settlement amount related to the termination. RSI then filed a claim seeking interest on the settlement amount. RSI argued that that interest was due because its termination settlement proposal had ripened into a claim under the Contract Disputes Act ("CDA") when the parties allegedly reached an impasse in the settlement negotiations. The Board held, however, that RSI failed to establish that it had a claim upon which interest was due, as the evidence demonstrated that there was no impasse in the negotiations. Because we hold that there cannot have been an impasse when the parties actually signed a settlement agreement, the government was indeed entitled to summary judgment. Therefore, we affirm the Board's decision.

## BACKGROUND

On July 29, 1991, the Army awarded a firm-fixed-price contract to RSI for the delivery of 50 computer and memory assemblies at a total contract price of $68,950. The contract included the April 1984 version of the Federal Acquisition Regulation ("FAR") "Termination for Convenience of the Government (Fixed Price)" clause. 48 C.F.R. § 52.249–2 (Fixed Price). On July 14, 1992, the Contracting Officer notified RSI by letter that the government was terminating the contract for convenience. The letter was accompanied by a contract modification of the same date. The government also sent a letter of instruction to RSI assigning settlement of RSI's termination costs to the Chicago–Milwaukee contract administration office.

On March 9, 1993, RSI submitted the termination settlement proposal at issue to the Termination Contracting Officer ("TCO"). On April 22, 1993, the Defense Contract Audit Agency ("DCAA") issued its audit report for the RSI proposal. The audit questioned several elements of RSI's asserted termination costs. On May 10, 1993, RSI representative Darwin Kulzer submitted a letter to the TCO regarding the status of numerous RSI termination settlement proposals, including the one at issue in this appeal. Although the letter states that RSI would "consider [the TCO's] correspondence and statements as [the TCO's] final decision," the letter does not make such a statement with reference to the instant termination settlement proposal. The only statement in the letter regarding the termination settlement proposal for the contract at issue is:

> This termination settlement proposal was audited by DCAA and prenegotiation discussions have occurred with the TCO. Production material and profit/loss calculations are in dispute. A partial payment request is pending. DCAA states that the audit was complete in April.

RSI president Philip Brenizer had a conversation with the TCO on May 4, 1993, in which he allegedly requested that the TCO either "immediately negotiate a settlement or issue a contracting officer's final decision." The May 10 letter from Kulzer memorializing this conversation characterizes Brenizer's request not as relating to the instant RSI termination settlement proposal, but rather as regarding a claim for equitable adjustment. Brenizer also

reported that in the same May 4 conversation the TCO stated her willingness to issue a partial payment of 90% of the termination costs recommended by the DCAA. That payment was issued on June 21, 1993.

On July 6, 1993, RSI notified the TCO that it needed to revise its termination settlement proposal because it had not yet resolved the settlement proposal with its subcontractor. On August 10, 1993, RSI sent the TCO a listing of the status of various settlement proposals. The letter references the instant termination proposal indicating:

> There has been no change in the settlement status of this termination proposal since RSI's last status report May 10, 1993. RSI is updating the termination proposal to include the [ ]subcontract termination settlement. This update will be submitted on August 11, 1993. This termination proposal was audited by DCAA and prenegotiation discussions have occurred with the TCO. Production material and profit loss calculations are in dispute. Please schedule a negotiation session by August 20, 1993.

(emphasis added). On September 9, 1993, RSI sent a letter regarding its various open termination proposals. With regard to the instant termination settlement proposal, the letter generally requested a meeting to develop "guidelines and timetables for negotiations of our unresolved claims." The TCO and the RSI president met on September 29, 1993. Following that meeting, RSI submitted revised inventory and cost information. The letter accompanying this revision stated, "[T]his information is being submitted as prescribed at the meeting ... and should be used by the TCO during negotiations." Appendix at 110 (emphasis added). A series of seven negotiation meetings were held between December 1993 and March 1994. A letter of September 13, 1994 from RSI notes, with regard to the instant termination settlement proposal, that "plant clearance is not completed at this time." Between the Fall of 1994 and September 1995, RSI and the Army engaged in several litigations before the Board concerning other contracts; however, no attempt was made to begin formal dispute proceedings with regard to the termination settlement proposal at issue here.

On September 18, 1995, the parties reached a termination settlement with respect to the instant contract in the amount of $52,275.13. The parties disagreed about whether interest was owed to RSI but agreed to set the issue aside for a subsequent claim. RSI submitted its interest claim on December 1, 1995, and the Contracting Officer issued a final decision denying the claim on December 12, 1995.

RSI appealed the Contracting Officer's final decision to the Board. The Board held that it was "unable to conclude that the parties had reached an impasse," finding that RSI "made no request for a contracting officer's decision or took any other action which we can regard as implicitly manifesting a desire for such a decision." The Board specifically rejected RSI's assertion that the May 10, 1993 letter was a request for a decision, finding that the language quoted by RSI "pertained to another of the parties' contracts."

On petition for reconsideration by the Board, RSI again asserted that the May 10 letter established a clear nexus between its request for a final decision regarding the equitable adjustment claim under the contract at issue and the instant termination settlement proposal. The Board reaffirmed its initial decision, holding that RSI failed to present evidence establishing that "despite the desire to settle, an impasse has been reached and the contractor is ready to begin the dispute process." *Rex Sys.* (reconsideration), slip op. at 2. RSI timely appealed to this court, which has jurisdiction under 28 U.S.C. § 1295(a)(10) (1994) and 41 U.S.C. § 607(g)(1)(A) (1994).

## DISCUSSION

### I

■ The CDA requires interest to be paid on all "claims" adjudicated in the

contractor's favor, starting from the date the Contracting Officer received the claim. *See* 41 U.S.C. § 611 (1994). However, under the terms of the FAR, interest may not be paid on negotiated amounts, including those arising from the government's decision to terminate a contract for convenience. *See* 48 C.F.R. § 49.112–2(d) (1995). Here, RSI asks the court to hold that it is entitled to interest on its negotiated termination settlement amount because, RSI asserts, the negotiations over the amount had broken down, or reached an "impasse," thus converting its termination settlement proposal into a CDA claim, according to our case law.

■ The parties did not dispute before the Board the underlying facts and the Board appeal was therefore decided on cross-motions for summary judgment. This court reviews the Board's conclusions of law, including grants of summary judgment, without deference. *See Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1446 (Fed.Cir.1997). The Board correctly stated that the question of whether, within the meaning of this court's decision in *James M. Ellett Construction Co. v. United States,* 93 F.3d 1537 (Fed.Cir.1996), there is an "impasse" between the parties "turns on the facts of each appeal," *Rex Systems,* ASBCA No. 49502, slip op. at 5. Nevertheless, we must review *de novo* the Board's underlying finding on summary judgment that RSI had not shown that the parties had reached an impasse in their negotiations.

Settlement proposals submitted under the termination for convenience clause of the FAR are by their very nature merely negotiating tools and not claims. The FAR clause anticipates negotiation, directing the terminated contractor to "submit a ... settlement *proposal* to the Contracting Officer" upon which the "Contractor and the Contracting Officer *may agree*" in whole or in part. 48 C.F.R. § 52.249–2(d)–

(e) (2000) (emphasis added). Nevertheless, this court has previously held that a termination settlement proposal may under certain circumstances be considered converted into a claim for purposes of establishing jurisdiction in the Court of Federal Claims. *See Ellett,* 93 F.3d at 1544. The Court of Federal Claims has jurisdiction only over actions brought on *claims* within twelve months of a Contracting Officer's final decision. *See* 41 U.S.C. § 609(a) (1994). Thus, jurisdiction in that court requires both a true "claim" before the Contracting Officer *and* a "final decision," timely challenged. In *Ellett,* this court addressed the "claim" component of CDA jurisdiction and held that under the facts of that case the termination settlement proposal became a claim because negotiations reached an "impasse" and thereafter in a letter the contractor implicitly requested a final decision on the proposal.

The factual scenario in this case is quite different. The *Ellett* TCO ignored the contractor's proposal and issued a unilateral decision as to the contractor's proposal and proper damages for the convenience termination. The contractor did not accept that amount but sought to challenge it in the Court of Federal Claims. By contrast, RSI signed a termination settlement agreement with the government and does not dispute the amount. Indeed, RSI could not challenge the settlement agreement because, regardless of whether there was a claim before the TCO, a settlement agreement is not a "final decision" by the TCO, but instead a mutually agreed upon resolution of termination rights.[1] RSI invites us to extend the *Ellett* definition of a claim to include a situation where a settlement agreement has actually been reached by the parties. This we decline to do. *See Ellett,* 93 F.3d at 1542–44.

■ In *Ellett,* this court held that ordinarily a termination settlement proposal

1. Unlike in *Ellett,* the jurisdiction of the Board is not at issue in this case because RSI later submitted a formal claim for interest, denominated as a claim and expressly requesting a final decision, and the Contracting Officer issued a final decision denying the claim.

"was not a claim because it was not submitted to the contracting officer for a decision." *Id.* at 1544. According to the *Ellett* court, any non-routine submission by a contractor meets the FAR definition of a claim if it is: (1) a written demand; (2) seeking as a matter of right; (3) the payment of money in a sum certain. *See id.* at 1542 (citing 48 C.F.R. § 33.201 (1995) and *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1574 (Fed.Cir.1995)). The FAR definition, however, merely elaborates that set forth in the CDA itself. To be a claim under the CDA, the submission must request a "final decision." *See Ellett,* 93 F.3d at 1543. A request for a "final decision," however, need not be "explicit." *Id.* That the contractor intended to make such a request could be " 'implied from the context of the submission.' " *Id.* (quoting *Heyl & Patterson v. O'Keefe,* 986 F.2d 480, 483 (Fed.Cir.1993)). The *Ellett* court held that such a request could be implied if the negotiations were at "an impasse." *Ellett,* 93 F.3d at 1544 ("Once negotiations reached an impasse, the proposal by the terms of the FAR and the contract, was submitted for decision; it became a claim."). Thus, the issue before this court is whether, on the record before the Board, RSI proved that the parties had reached an impasse such that RSI's settlement proposal had ripened into a claim.

In *Ellett,* this court discussed certain objective facts that indicated negotiations had reached an impasse. The record in that case reflected: (1) "fruitless" negotiations; (2) a subsequent written request by the contractor that the Contracting Officer "settle" its claims; and (3) a unilateral decision by the Contracting Officer, *i.e.,* an adjudicated claim. *Id.* at 1544.

In subsequent cases in which CDA jurisdiction was also challenged, the Court of Federal Claims and the Board have applied such factors in determining whether a negotiation had arrived at an impasse. Although, of course, these decisions are not binding on this court, we examine them here because they may assist in further defining the contours of an impasse as discussed in *Ellett.* In *McDonnell Doug-*

*las Corp. v. United States,* 37 Fed. Cl. 285, 292 (1997), *rev'd on other grounds* in *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319 (Fed.Cir.1999), the Contracting Officer told the contractor that he would not consider its termination settlement proposal; thus the court held that there was an impasse as soon as the Contracting Officer received the submission. In *Medina Constr. Ltd. v. United States,* 43 Fed. Cl. 537, 549 (1999), the fact that the government was statutorily required to break off termination settlement negotiations immediately upon learning that the contractor was being investigated for fraud, combined with the fact that the contractor had made an explicit request for a final decision, was found to be sufficient evidence that the parties had arrived at an impasse. In *Central Envtl., Inc. v. United States,* ASBCA No. 51,086, 98–2 BCA 29,912 (1998), the Board found the contractor's explicit request for a final decision, in conjunction with the Contracting Officer's refusal to meet to negotiate, established an impasse.

In *Ellett* and in each of the above cases, there was objective evidence that the negotiations had reached an impasse and clear indication by the contractor that it desired a final decision. In *Ellett,* the contractor requested that the TCO "settle" the claim. 93 F.3d at 1544. The request to "settle" was interpreted by the court as a request for a final *decision* because all the other factors, such as a fruitless negotiation and the issuance of an unilateral determination by the TCO, indicated that the negotiations had reached an impasse and that the negotiating process had been abandoned by both parties. *See id.* In each of the other cases, the contractor specifically requested a final decision and/or the TCO explicitly refused to negotiate, and other factors confirmed that no further negotiations would take place. Most significantly, in each case, including *Ellett,* the parties never reached a settlement. Objective evidence that negotiations had been abandoned by the parties is

necessary before the negotiations can be found to have reached an impasse. To require anything less would leave far too much ambiguity in the definition of an impasse and allow a finding of an impasse even though both parties were going through further negotiations. Certainly, a contractor may not be seen as requesting a final decision if, as here, the alleged request for such a final decision is accompanied by objective indicators that the contractor is continuing or intends to continue negotiating, e.g., requesting and attending negotiation meetings and submitting revised negotiation proposals.

## II

It is unclear at exactly what point RSI alleges the impasse in the negotiations arose. In its interest claim to the TCO, RSI sought interest from March 10, 1993, the date it submitted the termination settlement proposal. Here and before the Board, RSI emphasized its May 10, 1993 letter to the TCO. Because RSI and the TCO ultimately negotiated a settlement agreement that was apparently satisfactory to both parties, we hold that the Board correctly concluded that the negotiations never reached an impasse at any point; thus the exact start date of the alleged impasse is moot.

An impasse requires a stalemate or a break-down in negotiations. A negotiation that has truly broken down cannot ultimately result in a mutual agreement. In each of the above decisions addressing whether termination settlement negotiations had reached an impasse, the parties involved never reached a settlement agreement and the contractors were asking the court to determine that the negotiations had indeed come to an impasse. Here, RSI and the government signed a settlement agreement. That fact alone is conclusive that there was no impasse in these negotiations.

## III

■ Even if RSI and the government had not reached a settlement agreement, we would be unable to hold that the Board erred in finding the negotiations had not been shown by RSI to have reached an impasse. RSI appears to argue that its explicit request in the May 10, 1993 letter for a final Contracting Officer's decision on its equitable adjustment claim establishes that it also requested a final decision with regard to the termination settlement proposal. RSI asserts that an explicit request for a final decision on one claim under a contract, per se, establishes an impasse for all claims. This argument is illogical and implausible. Moreover, in *Ellett*, the court recognized that the FAR regulations "anticipate the submission of claims independently of the termination settlement proposal." *Id.* at 1548. Thus, the status of one claim does not determine that of a separate termination settlement proposal submitted. Rather, in determining whether the instant negotiation had reached an impasse, we must look to the parties' actions and statements with regard to the negotiations initiated by the termination settlement proposal.

Even accepting arguendo RSI's premise that the May 10, 1993 letter might be construed as a request for a final decision on the termination settlement proposal, we could only so construe it if RSI had proven that the negotiations were at an impasse. RSI's own actions belie an impasse. After sending the May 10 letter, RSI revised its proposal, specifically requested that negotiating meetings be scheduled, and participated in a number of negotiating meetings with the TCO. Furthermore, there is no evidence that the TCO ever refused to meet or negotiate with RSI.

■ RSI finally cites to a lengthy negotiation period with large gaps of time between negotiations as sufficient evidence of an impasse. Lengthy negotiations or passage of time, however, do not alone establish an impasse, particularly when negotiations eventually succeeded, as they did in this case.

## CONCLUSION

The Board correctly concluded that RSI has not demonstrated any of the factors identified by the *Ellett* court that might indicate that the negotiations had reached an impasse. We hold that the eventual settlement agreement is conclusive evidence that negotiations had not reached an impasse. In the absence of any objective indication that the negotiations had reached an impasse, the Board could not construe RSI's May 10 letter, or any of its subsequent submissions to the TCO, as requesting that the Contracting Officer issue a final decision on its termination settlement proposal.

We hold that the Board correctly concluded on summary judgment that the parties had not reached an impasse in their negotiations over RSI's termination settlement proposal and thus that RSI's submissions to the TCO could not be construed as a request for a final decision. Thus, RSI's termination settlement proposal could not have been found converted into a claim. Accordingly, the Board's decision to deny RSI's claim for interest on the settlement amount is

*AFFIRMED.*